UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NOHELYS JOHANA MARCANO ORIHUEN,<br><br>Plaintiff,<br><br>v.<br><br>ZULEMA KARINA GARCIA CABRERA,<br><br>Defendant. | Case No. _____<br><br><br>**<u>COMPLAINT</u>**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff NOHELYS JOHANA MARCANO ORIHUEN ("Nohelys" or "Plaintiff"), by her attorney, Michael Katz, for her Complaint against Defendant ZULEMA KARINA GARCIA CABRERA ("Zulema" or "Defendant"), sets forth and alleges as follows.

## <u>INTRODUCTION</u>

1. Plaintiff entered into a business relationship with Defendant, including the formation of a corporation. Plaintiff performed as was agreed within that business relationship. but Defendant never intended to honor her obligations and commitments and did not honor them. After benefitting substantially from Plaintiff's financial contributions, labor and intellectual capital, Defendant wrongly forced Plaintiff out of the business without due payment and compensation. Defendant further injured Plaintiff by making false statements and interfering with her business relationships with other parties.

2. Plaintiff is accordingly entitled to, and herein demands, damages on the grounds of fraudulent inducement, breach of contract, breach of fiduciary duty, conversion, unjust enrichment, injurious falsehood and tortious interference with contract. Plaintiff also demands declaratory relief as to the ownership of the corporation, namely that she is a 50% owner of Monarcas Jewelry Inc. ("Monarcas" or the "Corporation").

1

3. The amount of damages exceeds $75,000, as further detailed below.

## PARTIES

4. Plaintiff Nohelys is an individual who resides at 310 Allview Avenue, Brewster, New York. Plaintiff is a naturalized citizen and resident of the State of New York, and a citizen of the United States.

5. Defendant Zulema is an individual who resides at and is domiciled at 153 Pine Hill Road, New Fairfield, Connecticut. Upon information and belief, Defendant is a citizen of Guatemala and has been lawfully admitted for permanent residence in the United States.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because (a) Plaintiff is a citizen of the State of New York and Defendant is a citizen of a foreign state who has been lawfully admitted for permanent residence in the United States and is domiciled in the State of Connecticut, and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Alternatively, if Defendant is now a naturalized citizen of the United States, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because (a) Plaintiff is a citizen of the State of New York and Defendant is a citizen of the State of Connecticut, and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(1), as the District in which the Defendant resides.

## STATEMENT OF FACTS

**Background**

9. Nohelys and Zulema first met in 2014, when they both worked as waitresses in a restaurant, and they developed a close friendship. They stayed in touch even after Nohelys temporarily returned to her home country

10. Nohelys returned to the United States in 2017. Zulema had a business selling gold jewelry and Nohelys began to learn about the business.

11. Zulema did not have a physical jewelry store. Zulema would purchase bulk amounts of jewelry on credit from one or more suppliers. Zulema then sold the jewelry directly to her individual clients and also sold through an independent saleswoman. Clients would typically pay over time, on a scheduled "payment plan."

12. In 2018, Zulema and Nohelys entered into an agreement whereby Nohelys became an independent saleswoman for Zulema.

13. In 2021, Nohelys formed Marcano Jewelry LLC, as the 100% owner. This did not alter her relationship with Zulema as a salesperson, but it was a means by which Nohelys could develop and promote a distinctive business identity.

14. Thus, Nohelys developed the logo, colors, visual identity, and brand concept for Marcano Jewelry LLC. She created a website and set up Instagram, Facebook and TikTok accounts. She invested in recording equipment, lights, cameras, promotional merchandise (shirts, cups, posters) and office supplies. She started doing Facebook Live broadcasts, selling jewelry online and building a following. She set up an office/studio in a close friend's house and then in her apartment.

3

15.     Zulema's clients began telling her they saw Nohelys on social media, which drew Zulema's attention to Nohelys' success in promoting and growing her business through her use of these technologies.

16.     In October 2023, Nohelys and Zulema began doing Facebook Live broadcasts together. These broadcasts were done from Nohelys' office/studio, using Nohelys' equipment and Nohelys' social media accounts.

17.     Zulema was impressed by Nohelys' social media presence and capabilities and the growth in Nohelys' business. Zulema acknowledged that Nohelys had greater technical and organizational knowledge than she did.

18.     Zulema began to insist that she and Nohelys go into business together, creating a company as equal owners and opening a physical jewelry store.

**Zulema and Nohelys Form a Corporation and Nohelys Sets Up the Physical Store**

19.     Zulema and Nohelys engaged attorney Phillip Grimaldi who, on February 22, 2024, formed Monarcas Jewelry Inc. ("Monarcas" or the "Corporation") as a New York business corporation. The Certificate of Incorporation authorized the Corporation to issue 200 shares of stock.

20.     Although the Corporation did not issue stock certificates, the 50% ownership by both Zulema and Nohelys is shown in the contemporaneous JP Morgan Chase bank account opening document executed by Zulema, in her declared capacity as president of the Corporation.

21.     At the time of the incorporation, the Incorporator appointed Zulema and Nohelys as the two directors of the Corporation.

22.     There was never any formal appointment of officers.

23. During May and June 2024, Zulema and Nohelys had multiple conversations, in which they agreed upon the following.

a. Zulema told Nohelys that she was no longer just "another salesperson," but was now her "50% partner."

b. Zulema told Nohelys to no longer work as a waitress at the restaurant, so she could devote 100% of her time to the jewelry business, finding more clients and managing all the work that would be necessary for setting up and opening a physical jewelry store.

c. Zulema promised they would share her individual clients, Nohelys' individual clients and all new business generated. More specifically, Zulema told Nohelys that Nohelys would be entitled to 50% of the profit on Zulema's sales to Zulema's individual clients and 50% of the profit on sales to customers who purchased jewelry at the physical store, in addition to 50% of the profit on Nohelys' sales to Nohelys' individual clients.

d. In addition, for the period after Nohelys left her job at the restaurant and until the store opened, Zulema promised that Nohelys could keep 100% of the profit on Nohelys' sales to Nohelys' individual clients.

e. In the context of this agreement, the "profit" was recognized as 46% of the jewelry sale price. (The sale price was set such that "cost" of the jewelry, *i.e.*, the amount paid to suppliers, was 54% of the sale price. In this way, the "profit" was the excess of the sale price over the "cost.")

f. Zulema asked, and Nohelys agreed, that the business would operate under the new name Monarcas Jewelry, changing only the name on Nohelys' social media from "Marcano" to "Monarcas," but keeping everything else the same (logo, brand, colors, etc.), and expanding through advertising and live sales.

g. They estimated that they would need about $100,000 to set up and open the physical store. This would include, for example, the expenses of obtaining a lease, permitting, construction and purchasing a safe, display cabinets and other store fixtures.

h. Nohelys would arrange for a loan to the business of $100,000 from a friend of hers at 10% annual interest, which loan would be deposited into Monarcas' bank account. The business would repay this amount (plus interest) from the store's revenue.

24.     During this period, in May 2024, Nohelys and Zulema, as tenants on behalf of Monarcas, entered into a five-year lease for the jewelry store, covering the period from June 1, 2024, through May 31, 2029. The lease includes a five-year option to renew.

25.     Nohelys followed through on her commitments. She and Zulema met with Nohelys' friend, who agreed to lend the business $100,000 at 10% interest for one year. The friend required that Nohelys guarantee repayment, and Nohelys did so based on Zulema's agreement and assurance that the business would reimburse Nohelys if Nohelys herself had to repay the loan. Nohelys' friend transferred the funds to Monarcas' business account.

26.     Over the next several months, Nohelys devoted her time to setting up the jewelry store. She coordinated the permitting and construction processes. She designed and purchased jewelry display furniture. She purchased special window glass, a security door and a safe as needed for a jewelry store. She negotiated with a security company, and had security cameras and systems installed. She opened accounts with electric, gas and internet providers. She designed and purchased signage and had it installed. She procured commercial insurance, including a $500,000 gold insurance policy. She changed the name "Marcano" to "Monarcas" on her existing Marcano website and social media accounts so that they could be used for the new business.

27.     Nohelys performed the vast majority of these tasks on her own. Zulema was only present for a few meetings.

28.     Nohelys made additional financial commitments, including purchasing the store safe using a credit card that she had opened in her own name based on her credit.

29.     During this period, before the store was opened, Zulema agreed that Nohelys would be entitled to 50% of the profit on Zulema's sales to Zulema's individual clients that were made during Facebook live broadcast that were done from Nohelys' office/studio, using Nohelys'

equipment and Nohelys' social media accounts, but Zulema has never paid Nohelys the agreed amount.

**The Store Opens and Zulema Reneges on Her Commitments and Forces Out Nohelys**

30.     On December 7, 2024, Monarcas' brick and mortar store officially opened.

31.     Even with the store in operation, it was understood that both Zulema and Nohelys would continue to sell directly to their individual clients outside the store, as part of the Monarcas business. Zulema and Nohelys would share the profits equally on these "direct sales."

32.     It also was understood that Zulema would continue to sell through independent saleswomen. This was a separate business Zulema had been developing. This business was not part of Monarcas, and Nohelys did not have any share of it.

33.     Nohelys was responsible for organizing the accounts, using the same accounting software that she already had been using. She set up three "virtual jewelry stores" to segregate the revenues, but consistent with the parties' initial agreement.

   a.  Marcano Jewelry – revenues from Nohelys' direct sales to individual non-store clients, from which Nohelys would continue to keep 50% of the profit as she had in the past.

   b.  Suly's Jewelry – revenues from Zulema's direct sales to individual non-store clients. As part of their agreement to go into business together, Nohelys would start receiving 50% of the profit once the store opened. ("Suly" is Zulema's nickname, and "Suly's Jewelry LLC" is an LLC that Zulema formed in 2023.)

   c.  Monarcas Jewelry – revenues from store customers. Nohelys was entitled to 50% of the profit, but for these sales, the sharable profit would be the "net profit" after the payment of rent and other store expenses. These expenses were initially expected to be about $4,000 per month.

34.     Almost immediately, Zulema acted arbitrarily and unilaterally to take control of the business, reneging on her commitments and denying Nohelys the benefit of Nohelys' ownership and investment in the business.

7

35.     Although it had been agreed that Zulema and Nohelys would both be 100% present in the store during the first year, Zulema soon started arriving late, leaving early and being absent altogether. Nohelys opened the store every day at 10:30 a.m. and stayed a full day, seven days a week.

36.     Zulema unilaterally hired her two children to work in the store with weekly salaries of $700 and $800. Although the store did good business from the outset, the $6,000 per month that was paid to Zulema's children was added to the expected $4,000 per month that went to rent and other expenses, further reducing the shareable net profit.

37.     Zulema reneged on her commitment that Nohelys would receive 50% of the profit from Zulema's sales to her individual clients. At first, she declared that Nohelys would not share the profits on non-store sales. She then declared that she would not share profits even when her clients purchased jewelry in the store.

38.     In February 2025, Zulema told Nohelys that Monarcas Jewelry would not repay any of the $100,000 loan that Nohelys' friend had loaned to the business and that Nohelys had guaranteed, and on which the total including 10% interest would be $110,000. This was directly contrary to the explicit representation and agreement that Zulema had made less than one year earlier when she induced Nohelys to borrow the money.

39.     Nohelys had to borrow money from other friends to pay back the initial loan, and, with interest, now owes about $135,000. Zulema has continued to refuse Nohelys' repeated request that the business reimburse her for repaying the loan.

40.     Zulema initially agreed that the business should acquire the Lightspeed inventory management system, and Nohelys acquired it. Lightspeed would have enabled the business, *inter alia*, to automate the purchasing of inventory; to tag inventory items with unique serial numbers

8

and thus track them from purchase to sale; and to monitor inventory levels in aggregate and for different products.

41.    Importantly, using Lightspeed would have automated and facilitated the segregation of Monarcas merchandise from merchandise that Zulema acquired for her separate business of selling through independent saleswomen.

42.    Even though she had initially agreed to the purchase and use of Lightspeed, Zulema refused to use it once she understood what it could do. Instead, she insisted on controlling the inventory as her own property. Zulema continued her past practice of purchasing jewelry in her own name (or in the name of her 100% LLC). She would conceal the suppliers' invoices from Nohelys, which enabled her to charge Monarcas more than the cost she had paid her suppliers. This self-dealing reduced the amount of Monarcas' profits that would be split between herself and Nohelys.

43.    Zulema did not separate her purchases of Monarcas merchandise from her purchases of merchandise for her separate network of independent saleswomen. The jewelry items were not tagged with unique serial numbers, and she commingled the jewelry in the store's safe. This made it impossible for Nohelys to keep track of the inventory.

44.    Zulema constantly removed merchandise from Monarcas' inventory to supply her saleswomen without reimbursing Monarcas. This was completely adverse to Nohelys' interests and completely in violation of Zulema's representations and commitments.

45.    Nohelys continued working seven days a week at the store. If Zulema had worked full-time as was initially agreed, there would have been no need for her children to work at the store. Instead, she dealt with her own retail clients outside the store and continued to expand her network of independent saleswomen.

46.    Zulema would regularly allow and direct her independent saleswomen to pick up merchandise at the store, which required Nohelys to spend time assisting and educating them, even though they were not part of the Monarcas business.

47.    Indeed, Zulema would allow and direct her independent saleswomen to bring their clients to the store. There also were occasions on which the clients would appear at the store without the independent saleswoman, and Nohelys was required to deal with these clients, all without any participation in the profits from these sales.

48.    In addition to using and misappropriating Nohelys' uncompensated labor and corporate assets to support her network of independent saleswomen, Zulema copied and misappropriated corporate intellectual assets of Monarcas to create a separate jewelry business in Guatemala. Zulema copied the Monarcas brand, the logo, the design style and the custom furniture. To date, Zulema has opened three "Monarcas" stores in Guatemala, all essentially identical to the store that Nohelys set up in New York, as well as "Monarcas" internet and social media sites, all without compensating Nohelys.

49.    Nohelys continued to track Monarcas' business activity. As the store's sales and operations grew over the first half of 2025 and depended on cash flow, she did not withdraw for herself the full amounts to which she was entitled as part of the business and pursuant to the agreement. Instead, she anticipated that she would hold off until Monarcas' financial situation had stabilized.

50.    In July 2025, Nohelys was planning to review the financials with Zulema and explain and withdraw the amount to which she was entitled. However, on July 15, 2025, Zulema told Nohelys that she no longer wanted to continue the "partnership." She told Nohelys that the jewelry store was the inheritance she planned to leave her children. She demanded that Nohelys

10

sign over her 50% of the Corporation. In return Nohelys would only continue to receive the same 50% of profit on her non-store sales that she had always been receiving.

51.    Nohelys replied that it would be necessary to sit down together to review all the financials to determine the amount to which she was entitled, but Zulema never did.

52.    At the end of August 2025 Zulema instructed the security company to remove Nohelys' access to the security system. Even though Nohelys had the store keys, she could not open the store because she did not have the security system passwords.

53.    On September 2, 2025, Zulema falsely informed and certified to JP Morgan Chase bank that she was the sole 100% owner of Monarcas Jewelry.

54.    On the next day, Zulema told Nohelys on the phone that she should not come to the store anymore. She said that if Nohelys came to the store, she would be waiting at the store with the police. About 30 minutes later, a police officer called Nohelys, informing her that Zulema had requested their assistance to remove her from the store, telling them that Nohelys "refused to understand" that she was "just an employee" and that Zulema no longer required her services.

55.    The officer explained that Zulema had shown them a document that stated that she was the sole owner of the jewelry store. The officer explained that she had asked Zulema several times if Nohelys had stolen anything, and Zulema replied "no" each time. The officer recommended that Nohelys not return to the store to avoid further problems with Zulema and suggested to Nohelys that she seek legal representation.

56.    In the days and weeks after forcing out Nohelys, Zulema made multiple false oral and written statements to Nohelys' individual clients telling them, *inter alia*, that Nohelys was not an owner of the business, and that they should stop doing business with Nohelys. Many of these

11

clients were and remain on payment plans, and still owe money to Nohelys, and Zulema told them to stop paying Nohelys.

57. As a specific example, Zulema sent texts to one of Nohelys' client on September 9, 2025, saying, "I am the owner," "send the payments to me" and "don't send it to her."

58. Defendant regularly and continually exercised complete domination and control over Monarcas. For example, and without limitation, she regularly and continually disregarded corporate formalities, she commingled Monarcas' merchandise with her separate business merchandise and otherwise commingled corporate asserts with her own assets, she diverted Monarcas' merchandise to her separate business and otherwise took personal possession of Monarcas' assets without compensating Monarcas.

59. Defendant regularly and continually exercised her complete domination and control over the Corporation to commit fraud and perpetuate wrongs against Plaintiff that resulted in injury. For example, and without limitation, she made false statements to the bank to prevent Plaintiff from accessing the corporate bank account, she charged Monarcas more for merchandise than the cost that she paid to suppliers, she prevented Monarcas from honoring its obligations to Plaintiff and to third parties, she prevented Plaintiff from accessing records and other information necessary to understanding the amounts owed to Plaintiff and she made false statements and used false documents, all resulting in injuries to Plaintiff.

60. Defendant Zulema was an alter ego of Monarcas.

61. Plaintiff has been able to evaluate the damaging impact of Defendant's wrongful conduct based on review of information in Plaintiff's possession. Disclosure will enable Plaintiff to more fully and completely establish the amount of her injuries and damages.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Fraudulent Inducement)

62.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

63.    Defendant intentionally and successfully induced Plaintiff, *inter alia*, to (i) form Monarcas with Defendant, (ii) quit her full-time job as a waitress and instead work full time for Monarcas, setting up and opening a physical jewelry store and then operating the store, (iii) contribute to Monarcas her creative and intellectual capital in the form of the internet and social media accounts that she had previously developed and (iv) arrange for a $100,000 loan to Monarcas and guarantee that loan.

64.    Defendant represented and promised that, in return, (i) Plaintiff would have and enjoy a 50% ownership of Monarcas, (ii) Plaintiff would receive 50% of the profit generated by the business, which would include 50% of the profit on all sales made in the store and all direct sales made by Defendant outside the store, in addition to all direct sales made by Plaintiff outside the store, (iii) Plaintiff would receive 100% of the profit generated by direct sales made by Plaintiff before the opening of the store and (iv) Monarcas would repay the $100,000 loan, with interest, by July 2025 after the store was opened and began generating revenues or would reimburse Plaintiff if Plaintiff was required to repay the loan as a guarantor.

65.    Defendant's representations and promises were not made in good faith. She made them with the preconceived and undisclosed intention of not performing them. She made them only for the purpose of inducing Plaintiff's performance. She made them with the intent that she would force Plaintiff out once Plaintiff had set up the store and had trained Defendant's children to operate the store and had otherwise performed.

66.     Despite Plaintiff's performance as induced by Defendant, Plaintiff has not obtained the benefit of 50% ownership, has not received 50% of the profit on sales and has not been reimbursed for her repayment of the $100,000 loan and accumulated interest.

67.     Defendant's conduct is actionable as fraudulent inducement.

68.     Defendant is accordingly liable to Plaintiff for fraudulent inducement, in an amount to be determined at trial, but not less than $414,700.00. Moreover, Defendant's actions are so egregious and so shock the conscience that Plaintiff is entitled to punitive damages against Defendant, in an amount to be determined at trial, but not less than $2,500,000.00.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Breach of Contract)**

69.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

70.     Plaintiff and Defendant entered into an agreement whereby Plaintiff agreed to (i) form Monarcas with Defendant, (ii) quit her full-time job as a waitress and instead work full time for Monarcas, setting up and opening a physical jewelry store and then operating the store, (iii) contribute to Monarcas her creative and intellectual capital in the form of the internet and social media accounts that she had previously developed, (iv) arrange for a $100,000 loan to Monarcas and guarantee that loan and (v) act as a guarantor of Monarcas' financial obligations under a commercial lease and a credit card.

71.     In return, Defendant agreed that (i) Plaintiff would have and enjoy a 50% ownership of Monarcas, (ii) Plaintiff would receive 50% of the profit generated by the business, which would include 50% of the profit on all sales made in the store and all direct sales made by Defendant outside the store, in addition to all direct sales made by Plaintiff outside the store and (iii) Monarcas would repay the $100,000 loan after the store was opened and began generating revenues or would reimburse Plaintiff if Plaintiff was required to repay the loan as a guarantor .

14

72.     Plaintiff has performed in full. Plaintiff acted and performed in reliance upon Defendant's representations and promises as made in this agreement. Plaintiff's performance was unequivocally referable and in response to Defendant's representations and promises as made in the agreement. But for Defendant's representations and promises, Plaintiff would not have undertaken these actions.

73.     Defendant has failed to perform and is in breach of her obligations under this agreement.

74.     Plaintiff has been damaged by reason of Defendant's breach of her obligations under the agreement. Plaintiff's damages include, *inter alia*, profits that she should have received from Defendant and Monarcas, but did not receive through August 2025, as well as future amounts that are the direct and proximate result of Defendant's breach, which were within the contemplation of the parties and that are reasonably certain.

75.     Defendant is accordingly liable to Plaintiff for breach of contract, in an amount to be determined at trial, but not less than $1,731,100.00.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

76.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

77.     As a director of Monarcas, and as president and controlling person of Monarcas, Defendant owed fiduciary duties to Plaintiff as a shareholder of Monarcas.

78.     A fiduciary relationship existed between Defendant and Plaintiff, whereby Defendant was bound to exercise the utmost good faith and undivided loyalty toward Plaintiff throughout the relationship.

79.     Defendant's conduct as alleged herein, including self-dealing and misappropriation of corporate assets, was in breach of her fiduciary obligations to Plaintiff.

15

80.    Defendant's conduct in breach of her fiduciary obligations directly caused injury to Plaintiff.

81.    Plaintiff has been damaged by reason of Defendant's breach of her fiduciary obligations. Plaintiff's damages include, *inter alia*, profits that she should have received from Defendant and Monarcas, but did not receive through August 2025, as well as future amounts that are the direct and proximate result of Defendant's breach, which were diverted from Plaintiff and were retained by Defendant and that are reasonably certain.

82.    Defendant is accordingly liable to Plaintiff for breach of fiduciary duty, in an amount to be determined at trial, but not less than $1,731,100.00. Moreover, Defendant's actions are so egregious and so shock the conscience that Plaintiff is are entitled to punitive damages against Defendant, in an amount to be determined at trial, but not less than $2,500,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Conversion)

83.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

84.    Plaintiff had a possessory right or interest in 50% of the stock of Monarcas.

85.    Defendant intentionally and knowingly made false statements and used false documents to assert dominion over Plaintiff's 50% share of Monarcas, and to otherwise interfere with and appropriate Plaintiff's 50% share of Monarcas, all in derogation of Plaintiff's rights.

86.    Defendant's conduct is actionable as conversion.

87.    Fraud was essential to Defendant's conversion of Plaintiff's 50% share of Monarcas.

88.    Defendant is accordingly liable to Plaintiff for conversion, in an amount to be determined at trial based on the value of Monarcas. Moreover, Defendant's actions are so egregious

16

and so shock the conscience that Plaintiff is entitled to punitive damages against Defendant, in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Declaratory Judgment as to Stock Ownership)**

89. Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

90. The Monarcas Jewelry Inc. Certificate of Incorporation states that the Corporation shall have the authority to issue 200 shares of stock.

91. Although stock certificates were not issued at the time of incorporation, the 50% - 50% ownership by both Zulema and Nohelys is shown in the contemporaneous JP Morgan Chase bank account opening document that Zulema executed in her declared capacity as president of the Corporation.

92. At the time of incorporation, the Incorporator appointed Zulema and Nohelys as the two directors of Monarcas.

93. Nohelys has never sold or otherwise transferred her 50% ownership of the Corporation.

94. There has never been any corporate transaction or event terminating Nohelys' position as a director of the Corporation, and there has never been any corporate transaction or event that changed the number of directors.

95. Defendant unilaterally attempted to deprive Plaintiff of her equity ownership, *inter alia*, by knowingly misrepresenting to JP Morgan Chase Bank that she owns 100% of the stock of the Corporation.

96. Accordingly, a justiciable controversy and dispute exists between the parties.

97. By reason of the foregoing, Plaintiff is entitled to a judgment declaring that she is a 50% owner of Monarcas and remains one of the two directors of Monarcas.

17

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Unjust Enrichment)**

98.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

99.    Defendant retained the benefit, *inter alia*, of (i) sales made by Nohelys, Zulema and Monarcas for which Nohelys did not receive fair compensation, (ii) the $100,000 loan to Monarcas that Defendant refused to repay and that Plaintiff was forced to repay, (iii) Plaintiff's full-time labor, (iv) Plaintiff's training of Defendant's children to operate the store, (v) Plaintiff's social media and similar intellectual capital, and (vi) Plaintiff's work and activities in support of Zulema's independent saleswomen.

100.    Defendant retained the foregoing benefits without repaying and/or duly compensating Plaintiff.

101.    As a result, Defendant was unjustly enriched.

102.    Defendant is accordingly liable to Plaintiff for unjust enrichment, in an amount to be determined at trial, but not less than $356,100.00.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**(Injurious Falsehood)**

103.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

104.    Beginning in early September 2025, Defendant communicated orally and in writing to clients of Plaintiff, customers of the business and other third parties, clearly referring to Plaintiff and falsely stating that (i) Plaintiff only has "worked as a salesperson," (ii) Plaintiff never invested in the business,  (iii) "there is no partnership," (iv) "I am the owner," (iv) "everything that Marcano has … everything is mine," and (v) the business always belonged only to Defendant.

105.    It was reasonably foreseeable that these false statements would cause Nohelys' customers to stop paying Nohelys and stop purchasing new merchandise from Nohelys.

106.    None of Defendant's false statements are privileged or authorized.

107.    Clients stopped making payments to Nohelys and stopped purchasing new merchandise from Nohelys.

108.    Defendant's false statements caused injury to Plaintiff in her trade and business and will continue to cause injury to Plaintiff in her trade and business.

109.    Defendant's conduct is actionable as injurious falsehood.

110.    Defendant is accordingly liable to Plaintiff for injurious falsehood, in an amount to be determined at trial, but not less than $169,100.00. Moreover, Defendant's actions are so egregious and so shock the conscience that Plaintiff is entitled to punitive damages against Defendant, in an amount to be determined at trial, but not less than $2,500,000.00.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Tortious Interference with Contract)

111.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

112.    Nohelys had valid "payment plan" agreements with her individual clients. Under these agreements, Nohelys would sell and transfer jewelry to the client, in return for the client's promise to pay Nohelys over time.

113.    There were many such agreements in effect when Zulema forced Nohelys out of the business.

114.    Zulema knew of these agreements.

115.    Since forcing out Nohelys, Zulema communicated orally and in writing with many of these clients, and directed them to stop making payments to Nohelys. She told Nohelys' clients "I am the owner," "send the payments to me" and "don't send it to her," and made similar statements to this effect. Zulema has persisted in these communications with many of Nohelys' clients.

116. When a client of Nohelys' clients went to the store to make a payment, Zulema did not disclose that Nohelys was no longer at the store and took for herself the payment that the client intended to make to Nohelys.

117. Zulema went to the home of one of Nohelys' clients to collect payments in Nohelys' name. When the client asked Zulema directly if Nohelys knew that Zulema was collecting from him, Zulema falsely replied, "yes," that Nohelys knew, the client gave Zulema the weekly payments. In this manner, Zulema tricked the client into making payments to herself instead of to Nohelys.

118. Nohelys has been deprived of income and thereby damaged because her clients have stopped making payments to which Nohelys is entitled.

119. Defendant's conduct is actionable as tortious interference with contract.

120. Fraud was essential to Defendant's tortious interference with contract.

121. Defendant is accordingly liable to Plaintiff for tortious interference with contract, in an amount to be determined at trial, but not less than $169,100.00. Moreover, Defendant's actions are so egregious and so shock the conscience that Plaintiff is entitled to punitive damages against Defendant, in an amount to be determined at trial, but not less than $2,500,000.00.

**WHEREFORE**, Nohelys Johana Marcano Orihuen, the Plaintiff herein, demands judgment against Defendant Zulema Karina Garcia Cabrera as follows:

(a) On the First Cause of Action, judgment for compensatory damages in an amount to be proved at trial, but no less than $414,700.00, and punitive damages in an amount to be proved at trial, but no less than $2,500,000.00;

(b) On the Second Cause of Action, judgment for compensatory damages in an amount to be proved at trial, but no less than $1,731,100.00;

(c) On the Third Cause of Action, judgment for compensatory damages in an amount to be proved at trial, but no less than $1,731,100.00, and punitive damages in an amount to be proved at trial, but no less than$2,500,000.00;

(d)  On the Fourth Cause of Action, judgment for compensatory damages in an amount to be proved at trial, and punitive damages in an amount to be proved at trial;

(e)  On the Fifth Cause of Action, a judgment determining and declaring that Nohelys is a 50% owner of Monarcas and one of the two directors of Monarcas;

(f)  On the Sixth Cause of Action, judgment in an amount to be proved at trial, but no less than $356,100.00;

(g)  On the Seventh Cause of Action, judgment for compensatory damages in an amount to be proved at trial, but no less than $169,100.00, and punitive damages in an amount to be proved at trial, but no less than $2,500,000.00;

(h)  On the Eighth Cause of Action, judgment for compensatory damages in an amount to be proved at trial, but no less than $169,100.00, and punitive damages in an amount to be proved at trial, but no less than $2,500,000.00;

(i)  With respect to all Causes of Action, costs, disbursements, and interest; and

(j)  Such other and further relief as this Court deems just and proper.

Dated: March 29, 2026

*Michael Katz*

Michael A. Katz, Esq.
*Attorney for Plaintiff*
107 Cherry Street
Katonah, NY 10536-1003
(212) 682-6260
Email: MichaelAKatz@verizon.net

D.Conn. Bar No. 402037